**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHAWN MOHNEY, Administrator of the )<br>ESTATE OF LEVI MOHNEY, Deceased, )<br>v )<br>)<br>COMMONWEALTH OF PENNSYLVANIA; )<br>PENNSYLVANIA STATE POLICE; SCOTT )<br>NEAL, individually and in his official capacity )<br>as an officer of the Pennsylvania State Police; )<br>JEFFREY WILSON, individually and his official )<br>capacity as an officer of the Pennsylvania State )<br>Police; ROBERT HAGETER, individually and )<br>his official capacity as an officer of the )<br>Pennsylvania State Police; ALLEN )<br>CARMICHAEL, individually and his official )<br>capacity as an officer of the Pennsylvania State )<br>Police; LOUIS DAVIS, individually and his )<br>official capacity as an officer of the Pennsylvania )<br>State Police; FRANK PAWLOWSKI, )<br>individually and his official capacity as )<br>commissioner of the Pennsylvania State Police; )<br>and JOHN DOE(S) 1 through 10, individually )<br>and in their official capacities as employees of the )<br>Pennsylvania State Police; )<br>)<br>Defendants. )<br>) | 2:11-cv-340 |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the Court is CO-DEFENDANTS COMMONWEALTH OF

PENNSYLVANIA ("Commonwealth"), PENNSYLVANIA STATE POLICE ("PSP"), CAPT.

SCOTT NEAL ("Neal"), SGT. WILSON ("Wilson"), TROOPER HAGETER ("Hageter"), CPL.

CARMICHAEL ("Carmichael"), CPL. DAVIS ("Davis") AND FORMER COMMISSIONER,

FRANK PAWLOWSKI'S ("Pawlowski") MOTION TO DISMISS PURSUANT TO RULE

12(b)(6) (Document No. 10), with brief in support (Document No. 11).  Plaintiff Shawn Mohney

("Plaintiff"), the duly appointed representative of the estate of Levi Mohney ("Decedent"), has

filed a Memorandum of Law in Opposition to the Motion to Dismiss . . . (Document No. 12).

Accordingly, Defendants' motion is now ripe for disposition.

Factual and Procedural Background

As the law requires, all disputed facts and inferences therefrom are resolved in favor of

Plaintiff, the non-moving party. The following facts are drawn from the Amended Complaint,

and the factual allegations therein are accepted as true for the purpose of this Opinion.

This tragic case arises out of an encounter at the residence of the Decedent's girlfriend on

March 18, 2009.  For reasons unstated in the Amended Complaint, Defendants Davis,

Carmichael, and Hageter (collectively, the "Trooper Defendants") were called to the residence at

approximately 7:30 p.m.  The Decedent, who is alleged to have been mentally disabled prior to

and during the incident, had doused himself in gasoline before the Trooper Defendants had

arrived.  The Amended Complaint states that although Decedent was not armed or resisting

arrest, and in no way posed a threat "to any of the Troopers who entered the mobile home,"[1]

(Amend. Compl. at ¶ 24) they allegedly escalated the situation with aggressive tactics and

yelling.  Eventually, after the Decedent did not comply with an order, Trooper Hageter fired his

taser weapon at the Decedent, after which Decedent burst into flames.  Ultimately, he died from

the burns that he suffered.

The Amended Complaint states that when Troopers Davis and Carmichael arrived at the

scene, they positioned themselves outside a door on the north side of the home.  (Amend. Compl.

at  ¶ 17).  Trooper Hageter and another trooper were positioned on the west side of the home.

(Amend. Compl. at ¶ 17).  Davis then approached the door and knocked, ordering the Decedent

---

[1]    The Amended Complaint does not give any background leading up to the incident and does not state whether Decedent posed a threat to himself or others.

to present himself.  (Amend. Compl. at ¶ 18).  After the Decedent came to the door, he was asked

to come outside.[2]  (Amend. Compl. at ¶ 18).  He declined the request.  (Amend. Compl. at ¶ 18).

There are no direct allegations that Trooper Hageter or the other Defendants knew that

the Decedent was disabled or regarded him as disabled at the time.  However, Plaintiff avers that

the Decedent's mental illness was illustrated by two prior threats to commit suicide.

Specifically, Plaintiff points to a report prepared after the Decedent's death by an unnamed

trooper, which allegedly referenced a suicide threat the prior week to which Trooper Davis had

allegedly responded.  (Amend. Compl. at ¶ 20).  Further, the investigating trooper allegedly

checked off on his report that the Decedent had a mental health condition.

Even though Trooper Davis allegedly knew that the Decedent suffered from a mental

illness, Plaintiff avers that the Trooper Defendants did nothing to defuse the "tense situation,"

such as calling for a CRISIS Intervention Team or back-up personnel with proper training in

handling mentally disabled individuals.  (Amend. Compl. at ¶ 22).  Instead, they allegedly rushed

into the mobile home and yelled at the Decedent to lie on the ground.  (Amend. Compl. at ¶ 24).

When the Decedent did not go to the ground as ordered, it is alleged that Trooper Hageter

deployed his taser, which was being used in "barb" mode.  (Amend. Compl. at ¶ 25).

As soon as the taser barbs contacted the Decedent's body, he burst into flames because

his clothing had been doused with gasoline.  (Amend. Compl. at ¶¶ 26, 27).  The flames, which

engulfed the Decedent from head to toe, were eventually extinguished, but not until after the

Decedent had suffered serious burns over ninety-eight (98) percent of his body.  (Amend.

Compl. at ¶ 26).  He died several hours later.  (Amend. Compl. at ¶ 26).

Plaintiff avers that there was enough gasoline on the Decedent's clothing and in a

container that he was holding that the Trooper Defendants should have been aware of its

---

[2]   Plaintiff avers that when the Decedent came to the door, the Trooper Defendants could see his hands and noted
that he was not carrying a weapon.  (Amend. Compl. at ¶ 19).

presence.[3]  (Amend. Compl. at ¶ 27).  Further, it is Plaintiff's contention that the Trooper

Defendants were aware of or should have been aware of the rules and warnings provided by

Taser International, Inc., the manufacturer of the taser allegedly used by Trooper Hageter, with

respect to the use of tasers in the presence of flammable materials such as gasoline.  (Amend.

Compl. at ¶¶ 28-29).

      Plaintiff, individually and as Administrator of the estate of Levi Mohney, filed his

Original Complaint (Document No. 1) with this Court on March 15, 2011.  The following were

named as defendants: the Commonwealth, PSP, Neal, Wilson, Hageter, Carmichel, Davis,

Pawlowski, and unnamed "police officers, supervisors, trainers, instructors, employees, agents,

and/or employees," identified as "John Doe(s) 1 through 10."[4]  Defendants filed a motion to

dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Document No. 7).  In response, on May 27, 2011,

Plaintiff filed a four-count Amended Complaint (Document No. 9).[5]

      In Count I, the Amended Complaint sets forth claims pursuant to 42 U.S.C. § 1983

against the Trooper Defendants and Neal, Wilson, and Pawlowski (collectively, the "Supervisory

Defendants"), alleging that they caused Plaintiff to suffer fatal injuries in violation of his Fourth

and Fourteenth Amendment rights.  Specifically, Plaintiff avers that as a result of the Trooper

Defendants' conduct, the Decedent was deprived of his right to protection against unreasonable

and excessive force, to be secure in his person, and to due process of law.  Plaintiff further avers

that the Supervisory Defendants encouraged, tolerated, ratified, and were deliberately indifferent

to a number of "patter[n]s and practices, and customs," related to the use of excessive force "and

---

[3]   It is unclear whether the Trooper Defendants observed that the Decedent was holding a container of gasoline or
how they should have known that he had doused himself in gasoline.
[4]   According to the docket entries in this case, none of the John Doe Defendants have been served in this matter.
Nor has an attorney entered an appearance on their behalf.
[5]   Because of the filing of Plaintiff's Amended Complaint, the Motion to Dismiss the Original Complaint filed by
Defendants on May 10, 2011 (Document No. 7), will be **DENIED AS MOOT**.

to the need for more or different training, supervision, investigation, or discipline" with regard to the proper use of tasers and interaction with disabled individuals.

Plaintiff alleges in Count II that the Commonwealth, PSP and Supervisory Defendants failed to put in place reasonable procedures for interacting with persons with mental disabilities, even though they knew that a large percentage of police encounters occur with such persons, in violation of Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA"). The remaining counts state claims under the Pennsylvania Survival Act, 42 Pa. C.S.A. § 8302, and the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A § 8301.[6]

Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint. The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007), the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a ***plausible*** claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (emphasis added). A district court must conduct a two-

---

[6]   Defendants do not seek dismissal of Counts III and IV of Plaintiff's Amended Complaint, which are premised on Pennsylvania's Survival and Wrongful Death Acts. These are not independent, substantive causes of action, but rather are separate and distinct mechanisms by which a plaintiff may assert underlying claims. *See Sullivan v. Warminster Twp.*, 2010 WL 2164520, * 6 (E.D. Pa. 2010), *Holmes v. Lado*, 602 A.2d 1389, 1391, *allocator denied,* 530 Pa. 660, 609 A.2d 168 (1992). A wrongful death action compensates a decedent's survivors for the losses they have sustained as a result of the decedent's wrongful death. *Tulewicz v. Southeastern Pennsylvania Transportation* Authority, 606 A.2d 427, 431 (1992). "It is not an action for damages sustained by the deceased." *In re Hendrickson*, 274 B.R. 138, 150 (Bkrtcy. W.D. Pa. 2002) (citing *Dennick v. Scheiwer*, 113 A.2d 318, 319 (1955)). On the other hand, "a survival action is not a new cause of action but is a continuation in the deceased's personal representative of the cause of action which accrued to the deceased under the common law." *Id* (citing *Harvey v. Hassinger*, 461 A.2d 814, 817 (1983)).

part analysis when presented with a motion to dismiss for failure to state a claim.  First, the Court

must separate the factual and legal elements of the claim.  *Fowler v. UPMC Shadyside*, 578 F.3d

203, 210 (3d Cir. 2009).  Although the Court "must accept all of the complaint's well-pleaded

facts as true, [it] may disregard any legal conclusions."  *Id*. at 210-211.  Second, the Court "must

then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff

has a 'plausible claim for relief.'  In other words, a complaint must do more than allege the

plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."

*Id*. at 211 (citing *Iqbal,* 129 S. Ct. at 1949).  The determination of "plausibility" will be "'a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.'"  *Id*. at 211 (quoting *Iqbal,* 129 S. Ct. at 1950).

Legal Analysis

I.      Count I – Section 1983 Claims Against the Supervisory Defendants[7]

The Supervisory Defendants seek to dismiss the § 1983 claims against them in both their

official and individual capacities, raising two contentions.  First, they argue that as state

government officials, they are not subject to suit in their official capacities under § 1983.  In

addition, the Supervisory Defendants argue that the Amended Complaint fails to allege facts

sufficient to establish that they were "personally involved" in the commission of the alleged

wrong, which they suggest is necessary for liability to attach against them in their individual

capacities under § 1983.

Section 1983 does not create substantive rights, but rather provides a remedy for the

violation of rights created by federal law.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816

(1985).  To state a *prima facie* case under § 1983, a plaintiff must demonstrate that: (1) the

---

[7]    The Trooper Defendants do not challenge the claims against them in Count I.

alleged wrongful conduct was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). Both elements must be simultaneously present to sustain a claim.

A.  Official Capacity Claims

The Supervisory Defendants argue that Plaintiff's § 1983 claims against them in their official capacities should be dismissed. The Court agrees. The United States Supreme Court has instructed that suits against state government officials in their official capacities should be treated as suits against the state itself. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). It is well established that "a state is not a 'person' within the meaning of § 1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989). Furthermore, although "state officials literally are persons," they are not "'persons' under § 1983" and cannot be sued under the statute. *Id.* at 71. Accordingly, the claims against Defendants Neal, Wilson, and Pawlowski in their official capacities will be **DISMISSED** with prejudice.

B.  Individual Capacity Claims

The Supervisory Defendants also seek dismissal of the § 1983 claims against them in their individual capacities, arguing that the allegations of improper custom or policy and failure to train, supervise and discipline are not sufficient to establish that these defendants were personally involved in the alleged wrongful conduct. Plaintiff, in response, contends that the claim is premised on the "deliberate indifference" theory of supervisory liability, and thus facts related to the Supervisory Defendants' personal involvement in the alleged misconduct need not be pleaded.

Generally, in order to establish supervisory liability against government officials in their individual capacities under § 1983, a plaintiff must demonstrate that the officials were personally involved in the commission of the conduct alleged.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  *Id.*  However, the United States Supreme Court has recognized a second theory of supervisory liability in that "there are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).  In such case, a plaintiff must establish that the alleged "failure to train amounts to deliberate indifference to the rights of persons with whom the [untrained persons] come into contact."  *Id.* at 388; *see Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir. 1989) (policymakers may be liable under § 1983 if they, with "deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm").  Only then "can such a shortcoming be properly thought of as a [government] 'policy or custom' that is actionable under § 1983."  *City of Canton*, 489 U.S. at 388.  Accordingly, Defendants are not correct in asserting that personal involvement is a necessary element of a viable § 1983 claim.

Nonetheless, even taken in the light most favorable to Plaintiff, the facts pleaded in the Amended Complaint are not sufficient to constitute deliberate indifference.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action."  *Board of Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).  In view of that, the Supreme Court has explained that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, -- U.S.--, 131 S.Ct. 1350, 1360 (2011).

In his Amended Complaint, Plaintiff states that the Supervisory Defendants "have encouraged, tolerated, ratified, and had been deliberately indifferent to" a pattern of misconduct involving, among other things, the use of excessive force, the failure to establish proper procedures with respect to encounters with mentally disabled persons, the improper use of taser weapons, and the failure to discipline officers who were the subject of prior complaints. (Amend. Compl. at ¶ 35).  In addition, Plaintiff notes that the alleged "deficiency in training is illustrated by [Decedent's] treatment by the Defendants."  (Amend. Compl. at ¶ 23).  However, there are no facts offered in support of those conclusory statements.  The Amended Complaint does not establish the requisite pattern of constitutional violations necessary to make Plaintiff's supervisory liability claim plausible on its face.  Nor has Plaintiff provided any facts related to prior encounters between mentally disabled individuals who have doused themselves with gasoline and PSP officers, which would demonstrate the need for the sort of specialized training that Plaintiff alleges was lacking in this case.  *See, e.g., Agnello v. Straitiff*, 2011 WL 1458090, at * 3 (W.D. Pa. 2011) (granting motion to dismiss because plaintiff failed to plead facts, which if accepted as true, would show that defendants engaged in the requisite pattern of constitutional violations). Therefore, the § 1983 claims against Supervisory Defendants Neal, Wilson, and Pawlowski in their individual capacities will be **DISMISSED**.

II.      Count II – ADA and RA Claims

In Count II of the Amended Complaint, Plaintiff alleges that the Defendants violated the Decedent's right to be free from discrimination on the basis of disability under Title II of the ADA and § 504 of the RA.   The essence of these claims is that the Defendants' alleged failure to train police officers for peaceful encounters with mentally disabled persons and to establish a policy for handling such encounters resulted in discrimination against the Decedent and caused him to suffer fatal injuries.

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities by a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, under § 504 of the RA,

> [n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794.  In order to state a claim under either statute, a plaintiff must prove that he (1) is disabled, (2) is otherwise qualified for the services, programs or activities sought or would be qualified if the defendant had made reasonable modifications to the services, programs or activities, and (3) was discriminated against solely on the basis of his disability.  *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995).  The ADA does not define "programs, services or activities," however, the RA provides that "'program or activity' means all of the operations of . . . a department, agency . . . or other instrumentality of a State or of a local government[.]" 29 U.S.C. § 794(b).

A.  Claims Against Trooper Defendants and Supervisory Defendants

Defendants first contend that the ADA and RA claims against each of the Trooper Defendants and Supervisory Defendants should be dismissed.  The Court of Appeals for the Third Circuit has found that there is generally no individual liability under the ADA.  *See Emerson v. Thiel College*, 296 F.3d 185, 189 (3d Cir. 2002).  An exception exists when an individual is sued for prospective injunctive relief.  *See Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002) ("a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the 'legal fiction' of *Ex parte Young*[, 209 U.S. 123, 159-60 (1908)]").  However, Plaintiff does not seek any form of

injunctive relief.  Accordingly, none of the Trooper Defendants or Supervisory Defendants may be liable in their individual capacities for damages under Title II of the ADA.

Moreover, the RA applies only to entities that receive federal financial assistance.  *See Koslow*, 302 F.3d at 190 (quoting 29 U.S.C. § 794(a) (providing that the RA applies only to "any program or activity receiving Federal financial assistance")).  Because there is nothing in the Amended Complaint which suggests that any of the individual Defendants in this case receive federal financial assistance, they cannot be held liable in their individual capacities under the RA. In addition, because claims against state government officials in their official capacities are in essence suits against the state itself, *see Hafer*, 502 U.S. at 25, the Court will treat Plaintiff's ADA and Rehabilitation Act claims against the Trooper Defendants and Supervisory Defendants in their official capacities as suits against the Commonwealth and PSP.

As a result, the ADA and RA claims against individual Defendants Neal, Wilson, Hageter, Carmichael, Davis, and Pawlowski will be **DISMISSED** with prejudice.

B.   Claims Against the Commonwealth and PSP

The Court turns now to Plaintiff's ADA and RA claims against the Commonwealth and PSP.  Defendants raises several arguments in support of the dismissal of these claims: (1) the Eleventh Amendment of the United States Constitution bars ADA claims against the states and their agencies, (2) neither the ADA or RA applies in the context of an arrest made under exigent circumstances such as those described by Plaintiff in his Amended Complaint, and (3) even if the ADA and RA claims are conceivable, Plaintiff has failed to allege facts sufficient to establish that the Decedent was "disabled" within the meaning of the acts.  The Court will address each of these contentions *seriatim*.

1.   Whether the Eleventh Amendment bars Plaintiff's claims under the ADA

a.   General Principles of Law

Defendants argue that Plaintiff's claims under Title II of the ADA against the Commonwealth and PSP are barred by the Eleventh Amendment of the United States Constitution.  The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. Amend. XI.  The Eleventh Amendment has been interpreted as a bar to suits "by citizens against their own states" as well.  *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("*Garrett*").  The prohibition against suits may be lifted if (1) a state waives its immunity or (2) such immunity is abrogated by an act of Congress.  *Lavia v. Pennsylvania*, 224 F.3d 190, 195 (3d Cir. 2000).[8]

"Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Garrett*, 531 U.S. at 363 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000)). There is no question that Congress expressed its unequivocal intent to abrogate state sovereign immunity when it enacted Title II of the ADA.  *See* 42 U.S.C. § 12202 (providing that "[a] State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter"). Therefore, the only question before this Court is whether Congress' purported abrogation of the

---

[8]   The Court of Appeals for the Third Circuit has established that "a state program or activity that accepts federal funds waives its Eleventh Amendment immunity" and is therefore susceptible to suit under the RA.  *Bowers v. National Collegiate Athletic Association*, 475 F.3d 524, 545 (3d Cir. 2007).  Presumably, both the Commonwealth and PSP receive such assistance.  Accordingly, Defendants do not seek dismissal of Plaintiff's RA claims on Eleventh Amendment grounds, and this section of the Opinion will focus solely on Plaintiff's claims under the ADA.

states' sovereign immunity is a valid exercise of its enforcement power pursuant to § 5 of the Fourteenth Amendment.

The United States Supreme Court has adopted a three-step analysis for making such a determination, as articulated in *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997).  Under the *Boerne* test, a court must (1) identify "with some precision the scope of the constitutional right at issue;" (2) examine whether Congress identified a history and pattern of unconstitutional discrimination by the states; and (3) determine whether the rights and remedies created by the ADA against the states are congruent and proportional to constitutional injury sought to be prevented.  *Garrett*, 531 U.S. at 365, 368, 372-73.

Applying that test to Title I of the ADA, the Court in *Garrett* found that "[t]he legislative record of the ADA . . . fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled."  *Id*.  Instead, Congressional findings focused on employment discrimination in the private sector, and "Congress assembled only such minimal evidence of unconstitutional state discrimination in employment against the disabled."  *Id.* at 369-70.  Accordingly, at the second step of the *Boerne* test, the Court held that Title I did not validly abrogate the states' sovereign immunity.  *Id.* at 375.

With respect to suits brought under Title II (the portion of the ADA at issue in this case), the Supreme Court has found that, in certain circumstances, Congress has validly abrogated the states' Eleventh Amendment immunity.  In *Tennessee v. Lane*, 541 U.S. 509, 513 (2004), two paraplegic plaintiffs brought claims against the state of Tennessee alleging that they were denied access to the state courts due to their disabilities.  Although the Court framed the specific issue before it narrowly, and limited its holding to Title II claims involving access to the courts, it nonetheless explained that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs."  *Id.* at 524.  Specifically,

the Court noted that Congress had considered evidence of discrimination in areas such as education, access to the courts, transportation, communications, health care and other public services. *Id.* at 529. Thus, unlike in *Garrett,* the second step of the *Boerne* test was satisfied. At the final step of the *Boerne* tripartite test, the Court noted that "unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." *Id.* at 531. In light of such a history, the Court found that "Congress' chosen remedy . . . is congruent and proportional to its object of enforcing the right of access to the courts." *Id.* at 532. Thus, "Title II*,* as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34.

The Supreme Court again addressed the validity of Congress' purported abrogation of the states' sovereign immunity with respect to Title II of the ADA in *United States v. Georgia*, 546 U.S. 151 (2006). In that case, a paraplegic state prison inmate brought suit against the state, the state Department of Corrections, and several individual state prison officials "challenging the conditions of his confinement" in a Georgia prison under 42 U.S.C. § 1983 and Title II of the ADA. *Id.* at 154. The district court had dismissed plaintiff's § 1983 claim, finding that the "allegations in the complaint were vague and constituted insufficient notice pleading." *Id.* at 155. The Eleventh Circuit Court of Appeals reversed because "[plaintiff's] multiple *pro se* filings in the District Court alleged facts sufficient to support a limited number of Eighth Amendment claims under § 1983." *Id.* at 156. However, it "affirmed the District Court's holding that [the prisoner's ADA] claims for money damages against the State were barred by sovereign immunity." *Id.*

The Supreme Court disagreed.   In reaching its decision, the Court explained that "[plaintiff's] claims for money damages against the State under Title II were evidently based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment" because the Due Process Clause of the Fourteenth Amendment incorporates the provisions of the Eighth Amendment.  *Id.* at 157 (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)).   There is no doubt that Congress has the authority to create a cause of action that enables citizens to vindicate their Fourteenth Amendment rights.  *Id.* at 158. Therefore, the Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  *Id.* at 159 (emphasis in original).

The Third Circuit Court of Appeals has instructed that, in the wake of the Supreme Court's decision in *Georgia*, courts must "(1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such conduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3d Cir. 2007).  Applied in the context of access to public education, the Court of Appeals in *Bowers* determined at the outset that "the alleged misconduct . . . states a claim for violation of Title II but not the Fourteenth Amendment."  *Id.* at 554.  It went on to note, however, that "[t]he Court in *Lane* concluded that Congress had clearly identified a pattern of disability discrimination with respect to public services."  *Id.*  Moreover, the Court of Appeals found that "as applied to public education, Title II is a congruent and proportional" response to the pattern of discrimination identified by Congress.  *Id.* at 555.  The *Boerne* test was therefore met and "Congress acted within its Constitutional authority in

abrogating sovereign immunity under Title II of the ADA" in the context of access to public

schools. *Id.* at 556.  The Court will now apply these principles to the facts of this case.

> b.   Whether Plaintiff has Alleged a Fourteenth Amendment Violation

Plaintiff contends that the holding in *Georgia* controls in this case because he has alleged

an actual violation of his Fourteenth Amendment rights.  That is, he contends that the facts

alleged in support of his ADA claim are the same facts that support his Fourth Amendment

claim, which independently violate § 1 of the Fourteenth Amendment, and thus, Congress was

empowered to abrogate the states' Eleventh Amendment immunity.

The Court is not persuaded by this argument.  The Supreme Court has established that

"[w]here a particular Amendment provides an explicit textual source of constitutional protection

against a particular sort of government behavior, that Amendment, not the more generalized

notion of substantive due process, must be the guide for analyzing these claims." *Albright v.

Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  Here,

Plaintiff in essence claims that the Trooper Defendants used excessive force in attempting to take

the Decedent into custody, allegedly in violation of the Fourth and Fourteenth Amendments, and

that the Supervisory Defendants are concomitantly responsible for the alleged misconduct due to

a failure to train. The Fourth Amendment addresses "excessive force claims aris[ing] in the

context of an arrest or investigatory stop of a free citizen." *Graham*, 490 U.S. at 394.  In

*Graham*, the Supreme Court made clear that "*all* claims that law enforcement officers have used

excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure'

of a free citizen should be analyzed under the Fourth Amendment . . .  rather than under a

'substantive due process' approach." *Id.* at 395 (emphasis in original); *see Fagan v. City of

Vineland,* 22 F.3d 1296, 1305 n. 5 (3d Cir. 1994) ("excessive force claims against the police are

actionable under the Fourth Amendment rather than the substantive component of the Due

Process Clause" of the Fourteenth Amendment).  Accordingly, Plaintiff has not stated a claim for violation of the Fourteenth Amendment.

       c.   Whether ADA's Abrogation of Sovereign Immunity in Arrest Context is Valid

      Having made that determination, the Court must now decide whether Congress' purported abrogation of the states' immunity is nevertheless valid under the test established in *Boerne*.  *See Bowers*, 475 F.3d at 553.  At the first step of the *Boerne* analysis, the Court finds that the right at issue in this case is the right to be free from irrational discrimination on the basis of disability.  *See Lane*, 541 U.S. at 540 (explaining that "Title II purports to enforce a panoply of constitutional rights of disabled persons," including the equal protection right to be free from irrational discrimination; *Bowers*, 475 F.3d at 554 (concluding "[t]he right at issue in this case, as in *Lane*, is the right to be free from irrational disability discrimination").

      Moving to the second step of the analysis, the Court notes, as did the Court of Appeals in *Bowers,* that in reaching its finding at this stage "[t]he [*Lane*] Court considered evidence of disability discrimination in a variety of public services, not just limited to access to the courts." *Id.* at 554 n. 35 (citing *Lane*, 541 U.S. at 523-26).  Specifically, the Supreme Court in *Lane* analyzed Title II in a broad sense and found that "there was a documented 'pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting.'" *Id.* at 555 (quoting *Lane*, 541 U.S. at 525).  As a result, while the *Lane* Court purported to limit its holding to cases involving access to the courts, several courts of appeals, including our own, have nonetheless recognized "that the second prong of the *Boerne* test was conclusively established with respect to Title II by the *Lane* Court." *Id.* at 554 n. 35 (quoting *Cochran v. Pinchak*, 401 F.3d 184, 191, *vacated,* 412 F.3d 500 (3d Cir. 2005)) ("*Lane* considered evidence of disability discrimination in the administration of public services and programs generally . . . and concluded that Title II in its entirety satisfies

*Boerne's* step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations") [9]; *see also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) ("[a]fter *Lane*, it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services"); *Assoc. for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) ("the Supreme Court [in *Lane*] ruled that the second *Boerne* inquiry was satisfied").

Therefore, the Court's step-two inquiry is not limited to identifying a history and pattern of constitutional violations with respect to the particular conduct at issue in this case, i.e. police encounters with mentally disabled individuals. "[R]ather, the second step of the analysis set forth in *City of Boerne* requires a consideration of Title II in a broader sense." *Zied-Campbell v. Richman*, 2007 WL 1031399, at *9 (M.D. Pa. 2007). The Supreme Court has established that Congress' "finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Lane*, 541 U.S. at 529. The Court is thus bound by that determination and finds that step two of the *Boerne* analysis has been satisfied.

The third and final step of the *Boerne* analysis is whether the remedies created by Title II are congruent and proportional to the pattern of unconstitutional disability discrimination identified by Congress. The Supreme Court has instructed that, unlike the second step of the *Boerne* analysis, step three requires the Court to consider the specific context of Plaintiff's

---

[9]   The Third Circuit Court of Appeals' opinion in *Cochran v. Pinchak*, 401 F.3d 184 (2005) was vacated pending the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006). *See Cochran*, 412 F.3d 500. Nothing in the Supreme Court's decision in *Georgia*, however, calls into question the validity of the conclusion reached by both the majority and dissenting judge in *Cochran*, who agreed that "Title II in its entirety satisfies *Boerne's* step-two requirement." *Cochran*, 401 F.3d at 191 n. 3; *id.* at 195 (Scirica, C.J., dissenting) (noting that the Court in *Lane* identified a large body of evidence that satisfied the second step of the *Boerne* analysis).

claims and determine whether Congress appropriately responded to the specific conduct at issue. *See Lane*, 541 U.S. at 531 (explaining that at step three, "nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole").

Accordingly, the Court's inquiry at step three will focus on discrimination in the context of encounters between law enforcement personnel and mentally disabled individuals. *Lane* did not address the extent of irrational discrimination in this area. However, the Court's independent review of the legislative history of the ADA reveals that Congress expressly considered a pattern of such discrimination when it enacted the ADA. For example, a report before Congress identified "[i]mproper handling and communication with handicapped persons by law enforcement personnel" as an "area in which problems of discrimination occur." U.S. Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities 165 (1983). In addition, the House Committee on the Judiciary explained in its report:

> In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid for seizures.

H.R. 101-485(III).

The Court concludes that Title II's "reasonable modifications" mandate is a congruent and proportional response to such a scenario. As the *Lane* Court made clear, Title II "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided." 541 U.S. at 532. Indeed, the Judiciary Committee noted that "[the above-described] discriminatory treatment based on disability can be avoided by proper training." H.R. 101-485(III). Providing police officers with proper training for handling mentally disabled persons would not impose an undue burden on the Commonwealth or PSP. "It is, rather, a reasonable prophylactic measure, reasonably targeted to a legitimate end." *Lane*, 541 U.S. at 533.

In summary, the Court finds that Title II, as applied to cases involving the interaction between law enforcement personnel and mentally disabled individuals, is a valid exercise of Congress' authority pursuant to § 5 of the Fourteenth Amendment.  The Eleventh Amendment is therefore not a bar to Plaintiff's ADA claims against the Commonwealth and PSP**.**

    2.   Whether the ADA and RA Apply in the Context of Arrests

Defendants also maintain that the claims in Count II should be dismissed because, regardless of the ADA's constitutionality, the statutory text of the ADA and RA is inapplicable in the context of arrests.  In effect, the gravamen of their contention is that an arrest is not a "program, service or activity" for purposes of the ADA/RA.

As several courts have noted, it is somewhat difficult to apply the concepts "otherwise qualified" individual and "solely by reason of a disability," as well as the duty of reasonable accommodation, to law enforcement encounters with mentally disabled persons.  *See, e.g. Buchanan v. Maine*, 469 F.3d 158, 176, n. 13 (1st Cir. 2006) ("[i]t is questionable whether the ADA was intended to impose any requirements on police entering a residence to take someone into protective or other custody beyond the reasonableness requirement of the Fourth Amendment"); *Rosen v. Montgomery County, Maryland*, 121 F.3d 154, 157 (4th Cir. 1997) ("calling a[n] . . . arrest a 'program or activity' of the County . . . strikes us as a stretch of the statutory language and of the underlying legislative intent").  However, although our appellate court has not yet addressed whether the ADA and RA are applicable in this context, it has instructed that the terms "'[p]rogram or activity' [in the RA] . . . were intended to be all-encompassing."  *Yeskey v. Pa. Dept. of Corrections*, 118 F.3d 168, 170 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998).  Noting that "[the terms] include '*all* of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government," the Court in *Yeskey* held that state and locally operated correctional facilities come under the ambit of the

ADA and the RA.  *Id.* at 170-72 (citing 29 U.S.C. § 794(b)).  The United States Supreme Court unanimously affirmed the Court of Appeals' holding, concluding that "the statute's language unmistakably includes State prisons and prisoners within its coverage."  *Pa. Dept. of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998).

In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Court of Appeals for the Eighth Circuit applied the Supreme Court's rationale in *Yeskey* to ADA and RA claims brought by a wheelchair-bound arrestee for injuries sustained while being transported in a police van not equipped with wheelchair restraints.   The court reasoned that "[t]he fact that the statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'"  *Id.* at 912 (quoting *Yeskey*, 524 U.S. at 212).  Further the Court found it immaterial that the plaintiff had not volunteered to be arrested, as "[c]overed programs or services do not need to be voluntary."  *Id.*  Accordingly, the Court held, "[plaintiff's] allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework" of Title II.[10]  *Id.* at 913.

The Fifth Circuit Court of Appeals has taken a more limited view of the applicability of Title II in arrest situations, recognizing such claims only in the absence of exigent circumstances.  *See Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).  In *Hainze,* the plaintiff brought a claim similar to the one here, i.e. he alleged that the defendant county failed to reasonably accommodate his mental disability when taking him into custody after he had brandished a knife and refused police orders during a standoff.  *Id.* at 797-88.  The court noted the plaintiff's claim was distinguishable from that in *Gorman,* which involved police conduct after an arrest was made.  *Id* at 802.  Furthermore, it explained:

---

[10]   In *Gohier v. Enright,* 186 F.3d 1216, 1221 (10th Cir. 1999), the Court of Appeals for the Tenth Circuit also recognized in dicta that a plaintiff may be able to state an ADA claim arising from police conduct during an arrest.  However, because the plaintiff did not bring such a claim, the Court explained that whether the ADA applies under those circumstances "remains an open question in [the] circuit."  *Id.*

> [o]nce there was no threat to human safety, the [defendants] would have been under a duty to reasonably accommodate [plaintiff's] disability in handling and transporting him. That would have put this case squarely within the holdings of *Pennsylvania Dep't of Corrections v. Yeskey* and the cases that have followed.

*Id.* Thus, it held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene." *Id.*

Defendants suggest that Plaintiff's claim must be dismissed under the *Hainze* Court's exigent circumstances limitation.[11]  However, other district courts within the Third Circuit have recognized ADA claims in the context of arrests no matter the circumstances.  For example, in *Schorr v. Borough of Lemoyne*, 243 F.Supp.2d 232, 238-39 (M.D. Pa. 2003), the court distinguished *Hainze*, finding that, unlike in that case, "[p]laintiffs have not brought this action against any of the officers involved, nor are they challenging the degree of force used by the officers, and any exigent circumstances at the time of arrest are therefore irrelevant." *Id.* at 238.[12]  Instead, the plaintiffs' claim was premised on the Borough's alleged failure to train its police officers for peaceful encounters with mentally disabled individuals, which occurred well before the incident in question.  *Id.* Thus, because "the plain language of the statute, other legislative materials, and case precedent all strongly indicate that . . . modifying police practices to accommodate [disabled persons]" falls within the ADA, the court held that the plaintiffs' claim was cognizable.[13]  *Id.*

---

[11]    Even assuming that our appellate court would adopt the rule in *Hainze* and accepting as true Plaintiff's allegation that there were no exigent circumstances present, Plaintiff's Amended Complaint would still fail to state a claim upon which relief could be granted for reasons explained below.

[12]    As explained above, the Court has dismissed the ADA and RA claims against the individual Defendants.

[13]    The rationale in *Schorr* has been found persuasive by a number of courts within our Circuit.  *See, e.g., Hogan v. City of Easton*, 2004 WL 1836992, at *7 (E.D. Pa. 2004) (concluding "the Complaint states a valid claim under the ADA based on the failure of the [defendants] to properly train its police officers for encounters with disabled persons"); *Arnold v. City of York*, 2004 WL 2331781, at *8 (M.D. Pa. 2004) (applying *Schorr* and concluding that "plaintiffs may proceed with their ADA and Rehabilitation Act cause of action"); *Brodlic v. City of Lebanon*, 2005 WL 2250840, at *5 (M.D. Pa. 2005) (same); *but see Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 177 n. 3 (4th Cir. 2009) (explaining "[w]hile plaintiff attempts to pose training in dealing with those with mental health problems as an 'accommodation,' it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie").

Based on these decisions, as well as the Court's independent review of the ADA's legislative history as discussed above, the Court finds that Title II of ADA is potentially applicable in the context of arrests.

3.   Whether Plaintiff Pleaded Facts Sufficient to State a Claim under the ADA/RA

While such a claim may be conceivable, the Court notes again that it does not fit neatly into the statutory language of the ADA/RA or the established framework for analyzing an ADA or RA claim.  Thus, it is important to plead all of the factual circumstances necessary to make such a claim plausible. The difficulties in this case arise at the first and second prongs of the *prima facie* case claim of discrimination.

With respect to prong one, i.e. whether Plaintiff sufficiently alleged that the Decedent was disabled as defined by the ADA/RA, Defendants contend that Plaintiff has failed to plead any facts relative to how the Decedent's alleged mental condition constituted a "disability" that substantially limited a major life activity.[14]  Plaintiff responds by arguing that the Decedent was at least "regarded as" being disabled.  In support of that contention, Plaintiff notes that the unnamed PSP officer investigating the incident checked off and reported that the Decedent suffered from a mental health condition.  In addition, Defendant Davis had allegedly been called in response to the Decedent's suicide attempt the prior week.  Thus, according to Plaintiff, he should have known that the Decedent had a mental impairment.

---

[14]   Under the ADA, disability is defined as (A) having a physical or mental impairment that substantially limits one or more major life activities, (B) having a record of such impairment, or (C) being regarded as having such impairment.  *See* 42 U.S.C. 12102(1).  Prior to Congress' passage of the ADA Amendment Act of 2008, Pub.L. No. 110-325, § 2(b)(1)-(6), 122 Stat. 3553 (2008) ("ADAAA"), there were two ways in which a person could be regarded as being disabled: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activites, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999).  However, with the passage of the ADAAA, which became effective January 1, 2009 and overruled *Sutton*, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  The subject incident occurred after the ADAAA took effect, and thus the Court will discuss Plaintiff's claims with regard to the ADAAA's definition of "regarded as being disabled."

The Court finds this reasoning problematic for several reasons.  First, it is immaterial that an unnamed investigating trooper noted in a post-incident report that the Decedent had suffered from a mental disability.  Plaintiff has not alleged that the Decedent had a record of a mental condition or impairment before the incident.  *Cf. Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 437 (3d Cir. 2009) (explaining that to be considered as having a "record of such impairment" within the meaning of the ADA, a plaintiff must "provide evidence that [defendant] relied upon her record of impairment in making its employment decision").  In this case, the report was created *after* the alleged discriminatory conduct took place.  Therefore, it could not have formed the basis for the alleged discrimination.

In addition, even if the Court accepts as true that Defendant Davis knew of the Decedent's alleged mental disability, Plaintiff has not pleaded any facts which would allow the Court to impute such knowledge to any of the other Defendants.  In particular, Trooper Hageter allegedly used the taser improperly, and the Supervisory Defendants allegedly failed to provide adequate training, but there is no averment that any of them were aware of the Decedent's alleged condition.  The Court of Appeals for the Third Circuit has found that, in the context of employment discrimination claims brought under the ADA, "knowledge of one party cannot be imputed to another who is making the hiring decision." *Straining v. AT&T Wireless Services, Inc.*, 144 Fed.Appx. 229, 232 (3d Cir. 2005) (it is axiomatic that the employer must be aware of the disability) (citing *Olson v. General Elec. Astrospace*, 101 F.3d 947, 955 (3d Cir. 1996); *Kania v. Potter*, 358 Fed.Appx. 338, 343 n. 8 (3d Cir. 2009) (finding no basis on which to impute knowledge of co-worker to decision maker where decision maker never spoke about plaintiff job applicant with co-worker).

The Court finds that the same rationale applies to ADA/RA claims in the context of arrests.  Whether or not each Defendant regarded the Decedent as disabled bears directly on

whether such Defendant assumed a duty to reasonably accommodate Plaintiff's alleged disability and the scope of that duty.  Here, Plaintiff's Amended Complaint is simply devoid of any facts from which the court could impute Defendant Davis's alleged knowledge to the other Defendants.  Thus, the Court finds that Plaintiff did not sufficiently plead that the Decedent was disabled or that the Defendants were aware of that disability within the meaning of the ADA and RA.

Moving to prong two of the *prima facie* case of discrimination, any duty of reasonable accommodation that Defendants may have had is dependent on the factual circumstances at the residence of the Decedent's girlfriend.  As the Fourth Circuit Court of Appeals has observed in addressing this issue, "[r]easonableness in law is generally assessed in light of the totality of the circumstances . . . [a]ccommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence."  *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009).  Plaintiff baldly asserts that the Decedent posed no threat to any of the troopers and was not actively resisting arrest.  However, the Amended Complaint fails to state why the Trooper Defendants were called to the scene and whether the Decedent posed a danger to himself or others who may have been present in the home – critically important facts in determining what a reasonable accommodation would be in what Plaintiff termed a "tense situation."  (Amend. Compl. at  ¶ 24).  Moreover, even if Defendants were aware that the Decedent had a mental condition, the Complaint fails to aver facts to show that the Defendants should have reasonably anticipated (and accommodated) that he would have doused himself with gasoline.

In summary, the Court concludes that an ADA/RA claim is theoretically possible under a law enforcement encounter scenario.  Nonetheless, the Court finds that Plaintiff has not

sufficiently pled facts to support a plausible claim in this case.  Therefore, Defendants' Motion to Dismiss Plainitff's ADA and RA claims will be **GRANTED** without prejudice.


<u>Conclusion</u>

   In accordance with the foregoing, the MOTION TO DISMISS pursuant to Fed. R. Civ. P. 12(b)(6) (Document No. 10) filed by the Defendants will be **GRANTED**.  The Supervisory Defendants, the Commonwealth, and the PSP will be dismissed as parties.  The Trooper Defendants will be directed to file an Answer as to Counts I, III and IV of the Amended Complaint.

   An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SHAWN MOHNEY, Administrator of the**<br>**ESTATE OF LEVI MOHNEY, Deceased,**<br>　　　　　　　　v<br><br>**COMMONWEALTH OF PENNSYLVANIA;**<br>**PENNSYLVANIA STATE POLICE; SCOTT**<br>**NEAL, individually and in his official capacity**<br>**as an officer of the Pennsylvania State Police;**<br>**JEFFREY WILSON, individually and his official**<br>**capacity as an officer of the Pennsylvania State**<br>**Police; ROBERT HAGETER, individually and**<br>**his official capacity as an officer of the**<br>**Pennsylvania State Police; ALLEN**<br>**CARMICHAEL, individually and his official**<br>**capacity as an officer of the Pennsylvania State**<br>**Police; LOUIS DAVIS, individually and his**<br>**official capacity as an officer of the Pennsylvania**<br>**State Police; FRANK PAWLOWSKI,**<br>**individually and his official capacity as**<br>**commissioner of the Pennsylvania State Police;**<br>**and JOHN DOE(S) 1 through 10, individually**<br>**and in their official capacities as employees of the**<br>**Pennsylvania State Police;**<br><br>　　　　　**Defendants.** | )<br>)<br>)<br>)　**2:11-cv-340**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER OF COURT

AND NOW, this 19th day of August, 2011, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that:

CO-DEFENDANTS COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA

STATE POLICE, CAPT. SCOTT NEAL, SGT. WILSON, TROOPER HAGETER, CPL.

CARMICHAEL, CPL. DAVIS AND FORMER COMMISSIONER FRANK PAWLOWSKI'S

MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) (Document No. 7) as to Plaintiff's

Original Complaint is **DENIED AS MOOT**; and

CO-DEFENDANTS COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA STATE POLICE, CAPT. SCOTT NEAL, SGT. WILSON, TROOPER HAGETER, CPL. CARMICHAEL, CPL. DAVIS AND FORMER COMMISSIONER FRANK PAWLOWSKI'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) (Document No. 10) as to Plaintiff's Amended Complaint is **GRANTED** as follows:

(1) The claims in Count I against the Supervisory Defendants (Neal, Wilson and Pawlowski) in their official capacities are dismissed with prejudice;

(2) The claims in Count I against the Supervisory Defendants (Neal, Wilson and Pawlowski) in their individual capacities are dismissed without prejudice;

(3) The claims in Count II against the Trooper Defendants (Hageter, Carmichael and Davis) and the Supervisory Defendants (Neal, Wilson and Pawlowski) in their individual capacities are dismissed with prejudice;

(4) The claims in Count II against the Trooper Defendants (Hageter, Carmichael and Davis) and the Supervisory Defendants (Neal, Wilson and Pawlowski) in their official capacities are dismissed as duplicative of the claims against the Commonwealth and PSP; and

(5) The claims in Count II against the Commonwealth of Pennsylvania and the Pennsylvania State Police are dismissed without prejudice.

The Supervisory Defendants (Neal, Wilson and Pawlowski), the Commonwealth of Pennsylvania, and the Pennsylvania State Police are dismissed as parties and the caption of this case is hereby amended to read as follows:

| | |
|---|---|
| **SHAWN MOHNEY, Administrator of the** | ) |
| **ESTATE OF LEVI MOHNEY, Deceased,** | ) |
| **v** | ) |
| | ) **2:11-cv-340** |
| **ROBERT HAGETER, individually; ALLEN** | ) |
| **CARMICHAEL, individually; and LOUIS** | ) |
| **DAVIS, individually; and JOHN DOE(S) 1** | ) |
| **through 10, individually;** | ) |
| | ) |
| **Defendants.** | ) |

It is further ORDERED that the Trooper Defendants (Hageter, Carmichael and Davis)

shall file an Answer to Counts I, III and IV of the Amended Complaint on or before September

2, 2011.


BY THE COURT:

s/Terrence F. McVerry
United States District Judge


cc:     **Patrick G. Geckle**, **Esquire**
        Email: pgeckle@pgglaw.com

        **Thomas L Donahoe, Esquire**
        Email: tdonahoe@attorneygeneral.gov