IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN MOHNEY, Administrator of the ESTATE OF LEVI MOHNEY, Deceased, <br> v <br><br> ROBERT HAGETER, individually; ALLEN CARMICHAEL, individually; and LOUIS DAVIS, individually; and JOHN DOE(S) 1 through 10, individually; <br><br> Defendants. | ) <br> ) <br> ) 11-340 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 32), filed on behalf of the three remaining Pennsylvania State police officer Defendants, Trooper Robert Hageter ("Hageter"), Corporal Allen Carmichael ("Carmichael") and Corporal Louis Davis ("Davis"), with brief in support. Plaintiff Shawn Mohney ("Plaintiff"), the father and duly appointed representative of the estate of Levi Mohney ("Mohney"), has filed a Memorandum of Law in Opposition to the Motion (Document No. 36). The parties have also thoroughly developed their respective positions regarding the Concise Statement of Material Facts ("CSMF") and have submitted numerous exhibits (Document Nos. 34, 35, 37, 38, 41). Accordingly, Defendants' motion is now ripe for disposition.

Factual and Procedural Background

This tragic case arises out of an encounter between Levi Mohney and police officers in which Mohney erupted in fire and ultimately died. The incident occurred on March 18, 2009 at approximately 7:45 p.m., at the trailer of Mohney's ex-girlfriend, Patty Rae Ferris ("Ferris"). At

1

the time, Mohney was 24 years old, 6'0" tall, weighed 247 pounds, and had been a high school wrestler.[1]

In the weeks preceding March 18, 2009, Mohney had been involved in several incidents of which the officers were aware, including: vandalizing his grandfather's car with a crowbar; pushing and frightening his father; and being prohibited from going to his grandmother's house. On March 12, 2009, Davis responded to a call from Mohney's grandfather that Mohney was threatening to shoot himself at a Motel 6. After securing a shotgun from Mohney, Davis remained in the hotel room during a lengthy phone call between Mohney and a Clarion County Mental Health professional. Ultimately, the Mental Health worker advised Davis that, in her opinion, Mohney was not a threat to harm himself. Mohney also stated that he had no intention of hurting himself. As a result of these incidents, Mohney had been a topic of discussion at the state police "roll call."

Hageter knew Mohney from at least two prior interactions: (1) an incident in 2007 in which Mohney was accused of punching someone at a party and Hageter cited him for harassment; and (2) a subzero night on which Mohney was walking home from a bar and Hageter gave him a ride to the Ferris trailer.

Earlier in the day of March 18, 2009, there had been a series of incidents involving Mohney and Ferris. Around 1:00 p.m., Ferris called the Pennsylvania State Police to report that her trailer had been broken into; a 50-inch television had been taken; and she suspected that it was Mohney who had burglarized the trailer. A "be on the lookout" ("BOLO") notice was issued. Hageter and his partner, Trooper Herold, spent the last hours of their scheduled shift searching for Mohney without success.

---

[1] Carmichael and Davis, but not Hageter, knew that Mohney had been a wrestler.

At approximately 4:00 p.m. on March 18, Mohney was spotted at the Ferris trailer. Hageter and Herold were ordered by Carmichael to continue their work day and proceed to the trailer. Davis and Trooper Allen also responded to the scene. Ferris reported that Mohney had pushed his way into the trailer; and when Ferris went outside to check on her son Mohney chased her, shoved her down, and took her cell phone. Hageter Deposition at 36. In her witness statement (Exhibit D-8), Ferris stated that she was on the phone with 911 when Mohney grabbed the phone out of her hand. Hageter and Herold were directed to continue their search for Mohney at various known locations. At approximately 6:30 p.m., Carmichael spotted Mohney's truck, but Mohney eluded him by driving through a wheat field. Mohney was aware that he was the subject of a police search.

At approximately 7:30 p.m. on March 18, a neighbor called 911 to report that Mohney had returned to the Ferris trailer and climbed in through a window. Hageter and Herold drove back to the trailer. Carmichael and Davis also drove to the trailer, observed Mohney's truck, and parked behind it to prevent an escape. The officers arrived on scene at approximately 7:40 p.m. and took up positions around the trailer. There was no discussion of an operational plan for taking Mohney into custody.

Davis and Carmichael went on foot to the deck at the back of the trailer. Davis knocked on the sliding glass door, loudly identified themselves as state police, and asked Mohney to come outside. Mohney came to the door, opened the curtains, and shook his head and mouthed the word "no." He showed his empty palms to the officers. Mohney then stepped away from the door and closed the curtains.

Carmichael immediately smashed the glass door with his asp; Davis cleared the jagged glass; and they entered the trailer. Hageter, who had been at the corner of the trailer, also entered the trailer. Trooper Herold remained outside.

Upon entry, the officers saw Mohney standing in the corner of the living room. Mohney made a fist with his right hand, which was raised to his chest and he assumed what Carmichael described as a wrestling or fighting stance. Davis noticed a Bic lighter in Mohney's right hand.[2] Mohney was holding a Sierra Mist one-liter soda bottle in his left hand, which was down at his side.

As the officers entered the trailer, they were 10-15 feet from Mohney, and moved closer toward him. The officers were arrayed in a slightly offset line, with Davis to the left and closest to Mohney, Hageter in the middle and Carmichael in the right rear. The officers loudly commanded Mohney to get on the ground. Upon seeing no apparent weapon in Mohney's hands, Hageter transitioned from his gun to a taser. Carmichael also held a taser and Davis held a flashlight. Mohney did not comply with the officers' repeated commands to get on the ground or their warnings that he would be tasered. Davis thought Mohney was going to hit him. Hageter suspected that Mohney's non-compliance indicated an intention to fight. During the encounter, Mohney made no movement other than to raise his right fist to his chest area.

Hageter deployed his taser, with the intent to cause Mohney to fall to the ground so that the officers could take him into custody. Hageter estimated that he fired the taser within five to ten seconds after entering the trailer. Carmichael estimated that the efforts to get Mohney to comply took 10-15 seconds.[3] The barbs struck Mohney in the left chest area. Almost immediately, Hageter saw flames start in Mohney's right midsection area, which spread down to the floor and up to the ceiling. At the time, Davis was approximately 4-5 feet away from

---

[2] Carmichael and Hageter did not observe the lighter. Davis did not have a chance to communicate his observation.
[3] Plaintiff has submitted a "dash cam" videotape which depicts portions of the incident from the perspective of a patrol car parked in the driveway and facing the front corner of the trailer. The videotape does not have sound and does not show the rear of the trailer or any of the events which occurred inside. The time stamp on the video is off by one hour. Approximately twelve (12) seconds elapse from the time a trooper, presumably Hageter, disappears from the videotape to the rear of the trailer until an orange glow is reflected off the trees and Mohney then runs out of the trailer.

4

Mohney. Carmichael described the fire as "like an explosion and that the whole room just seemed to be all of a sudden engulfed in flames."

Mohney ran outside the trailer and collapsed about fifty yards away. The officers gave chase and attempted to extinguish the flames on Mohney with a blanket, and eventually succeeded in doing so. Mohney then told Carmichael that he had gas in the Sierra Mist bottle and intended to burn his furniture in the trailer. Troopers put out the fire inside the trailer with a dry chemical fire extinguisher. Mohney was transported to the hospital, but died the next day of thermal and inhalation injuries. He suffered third degree burns over 95% of his body.

The State Police Fire Marshal, Trooper Agosti, arrived on the scene at 11:30 pm and conducted an investigation into the origin and cause of the fire. Exhibit D-12. Among other things, Agosti reported that he found an empty 1-liter Sierra Mist bottle lying on the floor of the living room outside the burn pattern. Agosti observed the odor of gasoline "when I put my nose near the opening of the bottle." However, Agosti also stated: "There was no odor of gasoline inside the room." The carpet below the bottle was dry and did not emit a gasoline odor and there was no fire damage on the bottle. Agosti also found a blue Bic lighter in the living room, which was in working order and exhibited no fire damage. The bedroom was in disarray, as if Mohney had been searching for items. Agosti noted a burn pattern on the carpet which measured approximately 3 feet by 4 feet. In an interview at the scene, Davis informed Agosti that he had not observed any strange odors or odors of flammable liquids. In a separate interview, Hageter also told Agosti that he had not observed any such odors and explained that the taser had been activated for only two seconds as opposed to the five-second pre-set activation time.

The autopsy report, Exhibit D-11, reflected: "Laboratory tests confirm that the deceased had covered himself with gasoline." However, the actual laboratory tests have not been submitted as part of the record and it is unclear whether Mohney placed the gasoline on his

5

clothing, when, or how much gasoline was used.[4] Agosti opined that the fire originated on Mohney's clothing and offered two theories: (1) that Mohney was covered in a flammable liquid which was ignited by the taser; or (2) that Mohney was covered in a flammable liquid which he ignited himself with the lighter. He stated that neither theory could be confirmed and that the investigation would continue.

The case management order required Plaintiff to submit all expert reports by August 15, 2012. Plaintiff submitted an expert report from Charles Drago regarding police procedures in dealing with mentally ill citizens and the use of force. Plaintiff did not submit an expert report regarding the origin or cause of the fire or whether the odor of gasoline could have been detected.

On May 27, 2011, Plaintiff filed a four-count Amended Complaint. On August 19, 2011, the Court issued a Memorandum Opinion and Order which dismissed Supervisory Defendants Neal, Wilson and Pawlowski, the Commonwealth of Pennsylvania, and the Pennsylvania State Police as parties, but permitted Counts I, III and IV to proceed against officers Hageter, Carmichael and Davis. Count I of the Amended Complaint sets forth claims pursuant to 42 U.S.C. § 1983, alleging that the officers caused Mohney to suffer fatal injuries in violation of his Fourth and Fourteenth Amendment rights. Specifically, Plaintiff averred that as a result of the Defendants' conduct, Mohney was deprived of his right to protection against unreasonable and excessive force, to be secure in his person, and to due process of law. Counts III and IV arise under the Pennsylvania Survival Act, 42 Pa. C.S.A. § 8302, and the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A § 8301, respectively.

---

[4] The Death Investigation Report, Exhibit P-3, noted that all of Mohney's clothing, except for remains of a hat, shoe and sock, had been consumed by the fire.

Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, the non-movant must show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Legal Analysis

Defendants seek summary judgment on the ground that their actions did not constitute excessive force and/or that they are entitled to qualified immunity. Defendants also contend that Plaintiff cannot prove causation (i.e., that the fire was ignited by the taser rather than the lighter held by Mohney). Plaintiff contends that summary judgment is not warranted, in that Defendants allegedly violated the "use of force" guidelines and the standards for dealing with mentally ill citizens, as opined by the expert on police practices. Plaintiff further contends that even though "all of the Defendants maintain that they did not detect the smell of any gasoline inside this small trailer, it should be left to a jury to determine whether or not their denials are believable."

7

A. May the Jury Decide Whether the Officers Detected the Odor of Gasoline?

As a threshold matter, the Court must resolve whether the evidentiary record would allow a jury to find that there was an odor of gasoline. This dispute is material because both sides agree that use of a taser in the presence of gasoline presents a risk of deadly force.

> Paragraph 28 of Defendants' CSMF states: "None of the Officers were aware, prior to the fire, that the bottle of Sierra Mist actually held gasoline."
>
> Plaintiff's Responsive CSMF ¶ 28 states: "It is admitted that all of the officers testified that they were not aware that the Sierra Mist bottle held gasoline. However, there is circumstantial evidence, including the size of the fire which broke out as well as the fact that the investigating fire marshal, Trooper Agosti, noticed the [odor] of gasoline coming from the empty Sierra Mist bottle after the fire occurred."
>
> Paragraph 55 of Defendants' CSMF states: "Neither of the Corporals or Trooper Hageter observed or smelled any gasoline or flammables or flammable vapors before the fire actually started."
>
> Plaintiff's Responsive CSMF ¶ 55 reflects: "Admitted. Denied as stated. The circumstantial evidence including the size of the fireball which is depicted on the dash cam video as well as the observations made by the fire marshal, Trooper Agosti, present circumstantial evidence which contradicts the testimony of the corporals and Trooper Hageter."

Each of the Defendants testified under oath in their depositions that they never detected an odor of gasoline prior to the taser being used and they made similar statements in all of the post-incident reports. Plaintiff averred in the Amended Complaint that there was enough gasoline on the Decedent's clothing and in a container that he was holding that the Trooper Defendants should have been aware of its presence. (Amend. Compl. at ¶ 27). However, Plaintiff has produced no actual evidence to support this averment. Nevertheless, Plaintiff asks the Court to submit this question to a jury so that the jurors may conclude that Defendants are

8

lying. In support of his position, Plaintiff points to the size of the fireball which is depicted on the dash cam video and the investigation made by the fire marshal, Trooper Agosti.

The investigation of Trooper Agosti actually supports the testimony of Defendants. Agosti reported: "There was no odor of gasoline inside the room." Agosti only observed the odor of gasoline "when I put my nose near the opening of the [Sierra Mist] bottle." Defendants were several feet away from Mohney and the bottle. In sum, Agosti's report would not justify a reasonable jury to disbelieve Defendants' testimony.

The laboratory testing conducted on the clothing has not been made a part of the record. The record does not reflect how much gasoline was on Mohney's clothing. Moreover, Plaintiff has not submitted any expert opinion regarding the size of the fire, the amount of gasoline necessary to create such a fire, the time the gasoline may have been placed on Mohney's clothing, or whether an odor should have been detectable. *See, e.g., United States v. Aman*, 748 F. Supp.2d 531, 542-43 (E.D. Va. 2010) (discussing admissibility of expert testimony regarding testing for gasoline on clothing recovered from scene of fire); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 643 F. Supp.2d 482, 485 (S.D.N.Y. 2009) (expert in sensory evaluation methods permitted to testify concerning odor detection threshold of gasoline additive).

Thus, the only item of evidence that may add support to Plaintiff's theory is the dash cam video. The video does depict what appears to be the reflection from a sizable, quickly-ignited fire. However, the video does not directly show the actual fire or any of the events inside the trailer. Obviously, the video does not contain any evidence whatsoever regarding the odor of gasoline. The jury would be required to engage in pure speculation to fill in the many gaps. *See Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (refusing to submit issue to jury for speculation) (citations omitted).

Numerous appellate decisions instruct that issues should not be submitted to the jury without an adequate evidentiary foundation. In *Island Software and Computer Service, Inc. v. Microsoft Corp.*, 413 F.3d 257, 261-62 (2d Cir. 2005), the Court explained:

> Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (noting that "if the [defendant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden") (footnote omitted); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (emphasizing that "appellee cannot defeat summary judgment . . . merely by impugning [a witness's] honesty," or "by promising in his appellate brief that at trial he will demonstrate how the [witness's testimony] is false").

*Accord Levesque v. Doocy*, 560 F.3d 82, 87 (1st Cir. 2009) ("[A] mere challenge to the credibility of a movant's witnesses without any supporting evidence does not raise a trialworthy issue of fact.") (*citing Favorito v. Pannell*, 27 F.3d 716, 721 (1st Cir. 1994)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256-57, the United States Supreme Court explained:

> As we have recently said, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.

The opinion of the Court of Appeals for the Third Circuit in *Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011), is consistent with these decisions. To be sure, the Court cautioned:

> Because "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), we have recognized that a court ruling on summary judgment in a deadly-force case "should be cautious . . . to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify,'" *id. (quoting Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Thus, a court should avoid simply accepting " 'what may be a selfserving account by the officer[s]. It must

also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id. (quoting Scott*, 39 F.3d at 915).

*Id*. at 181-82. However, the *Lamont* Court then immediately explained:

> This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. *Cf. Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Just as in a run-of-the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, "and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account."

*Id*. at 182 (citations omitted.)

In accordance with the foregoing, the Court concludes that the uncontroverted evidence of record establishes that the officers did not detect an odor of gasoline in the trailer prior to the 10-15 second confrontation which resulted in use of the taser. Plaintiff has not submitted evidence by which a reasonable jury could disbelieve the officers, but instead, has presented a conclusory attack on their credibility and veracity.[5] The Court now turns to the evaluation of the excessive force claim, based on this determination.

### B. Could a Reasonable Jury Conclude That the Officers Used Unreasonable Force?

The general legal principles regarding claims of excessive force were succinctly summarized in *Estate of Awkward v. Willingboro Police Dept.*, 2010 WL 3906785 *5-6 (D.N.J. 2010) (granting summary judgment to officers in case involving mentally ill person who died by positional asphyxia while being taken into custody):

---

[5]In its independent research, the Court uncovered a somewhat factually similar case that was not cited by the parties, *Brown v. Burghart*, 2012 WL 1900603 (E.D. Pa. May 25, 2012) (suspect caught on fire after being tasered by officers), in which the Court denied summary judgment. However, *Brown* is distinguishable because the taser was used near a scooter which had crashed and was leaking gasoline. The Court concluded that a reasonable jury could find that the officers should have been cognizant of the risk of fire. Such a supposition is not reasonable under the facts and circumstances of this case.

11

In determining whether excessive force was used, the Fourth Amendment's "objective reasonableness" test is applied. *Sharrar v. Felsing*, 128 F.3d 810, 820–21 (3d Cir. 1997) (*citing Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (relying on *Graham*, 490 U.S. at 396; *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995)). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id*.

In evaluating the proper test for objective reasonableness, the Supreme Court has provided that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation omitted). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

In this case, Plaintiff contends that Mohney was merely non-compliant with officer commands and had done nothing to indicate any imminent threat to the officers or others. Accordingly, Plaintiff reasons that pursuant to the Pennsylvania State Police "use of force" continuum, the officers should have used OC spray/pressure point control, strikes or kicks, or an impact weapon such as a baton, to gain compliance by Mohney. Plaintiff contends that use of a taser was not warranted because officers are instructed to use a taser to "incapacitate/restrain" rather than to obtain "compliance."

As an initial matter, Plaintiff's reliance on state police policy guidelines is misplaced. The source of Mohney's rights is the Fourth Amendment to the United States Constitution, rather than the Pennsylvania State Police procedures manual. Because the Fourth Amendment protects citizens from unreasonable seizures, the ultimate issue is whether the officers acted reasonably,

12

not whether they followed department guidelines. As explained in *Ickes v. Borough v. Bedford*, 807 F. Supp.2d 306, 320-21 (W.D. Pa. 2011):

> This alleged breach of protocol, however, has no bearing on the constitutional analysis in this case. Although the particular practices of law enforcement entities may "vary from place to place and from time to time," the objective reasonableness of a police officer's actions under the Fourth Amendment does not "turn upon such trivialities." *Whren v. United States*, 517 U.S. 806, 815 (1996).

In *Ickes,* an officer used a taser against a 72-year-old handicapped man who was accused of using a tape recorder at the Bedford County Courthouse. Nevertheless, the Court held that the officer was entitled to qualified immunity. The Court characterized the use of a taser as "an intermediate or medium, though not insignificant, quantum of force that causes temporary pain and immobilization." *Id*. at 321 (*citing Sanders v. City of Fresno*, 551 F. Supp.2d 1149, 1168 (E.D. Cal. 2008). The Court further explained that Ickes was actively resisting arrest despite having been warned that a taser would be used.

With that background, the Court will now consider the totality of the circumstances in this case as set forth in the evidentiary record construed in the light most favorable to Plaintiff. The officers were attempting to arrest Mohney for several crimes, including burglary, assault, and flight from a police officer. At the time, Mohney was unlawfully in the Ferris trailer. Mohney was a 247 pound, 24-year-old male who was apparently unarmed, but had assumed a fighting or wrestling stance. Although the officers could see that Mohney's hands were empty of weapons, Corporal Davis knew that there was a possibility that Mohney had a gun in the vicinity, given his recovery of a shotgun from Mohney at the Motel 6 several days earlier. The officers knew that Mohney had been involved in several violent incidents involving his family members in the prior weeks, in addition to the events that day. In sum, the officers knew that Mohney had the potential to be violent and dangerous. At the time the taser was activated, Mohney was standing still and he could not easily escape from the trailer. On the other hand, Mohney had

refused to come out of the trailer (by mouthing "no" and retreating from the door); had refused to obey the officers' repeated commands to get on the floor; had assumed a fighting stance; and earlier that afternoon he had evaded arrest by driving through a wheat field. Mohney was warned repeatedly that a taser would be used if he did not submit. The duration of the specific confrontation in the trailer was a matter of seconds. However, officers had been attempting to apprehend Mohney for the majority of the day. The use of the taser took place in the context of effectuating an arrest. Mohney was the only person with whom the police officers had to contend at the time.[6]

The result of the encounter on the evening of March 18, 2009 was certainly tragic. Nevertheless, even assuming arguendo that the taser ignited the fire, the Court concludes that the officers acted reasonably. In *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (involving suspect's death from fall out of second-story window after being tasered), the Court of Appeals explained that the tragic, unforeseeable consequences of an officer's use of a taser do not render an otherwise reasonable seizure unconstitutional. As explained above, the officers had no indication that Mohney had placed gasoline on his clothes and they could not have reasonably anticipated that use of the taser would result in Mohney's death.

Under the tense, uncertain, and rapidly-evolving circumstances that evening, the officers made an objectively reasonable split-second judgment that use of a taser was necessary. Their decision must be judged by their perspective at the time, not second-guessed with the benefit of 20/20 hindsight. *Graham v. Connor*, 490 U.S. at 36-97.

---

[6] The expert report of Charles Drago places great emphasis on the officers' alleged failure to recognize and deal with Mohney's alleged mental illness, which he contends the officers should have been aware of due to the alleged threatened suicide incident at the Motel 6. However, the evidentiary record reflects that after a lengthy telephone call with Mohney, a Clarion County Mental Health professional advised Davis that Mohney was not a threat to harm himself. While in the motel room, Mohney also told Davis that he had no intention of hurting himself.

Conclusion

In accordance with the foregoing, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 32) will be **GRANTED**. Judgment will be entered in favor of Defendants and the case will be docketed closed.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN MOHNEY, Administrator of the ESTATE OF LEVI MOHNEY, Deceased, <br> v <br><br> ROBERT HAGETER, individually; ALLEN CARMICHAEL, individually; and LOUIS DAVIS, individually; and JOHN DOE(S) 1 through 10, individually; <br><br> **Defendants.** | ) ) ) ) ) 2:11-cv-340 ) ) ) ) ) ) ) |

## ORDER OF COURT

AND NOW, this 30th day of January, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 32) is **GRANTED**. The clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Patrick G. Geckle**, **Esquire**
Email: pgeckle@pgglaw.com

**Thomas L Donahoe, Esquire**
Email: tdonahoe@attorneygeneral.gov